JOURNAL ENTRY AND OPINION
{¶ 1} In this action for breach of contract, defendant-appellant/cross-appellee Herbert Ellis, owner of a corporate entity called Aquatic Amusement Associates, Ltd., challenges the trial court opinion and order that granted judgment to plaintiff-appellee Theodore M. Garver.
 {¶ 2} Ellis asserts the trial court's order should be reversed because it improperly held him personally liable on a corporate debt, and, thus, he should have been awarded attorney fees in defending the case.
 {¶ 3} Plaintiff-appellee Gary Zuercher has filed a cross-appeal from the trial court order, which awarded him nothing on his claim against Ellis. Zuercher asserts the trial court misinterpreted the settlement agreement between the parties; therefore, his claim against Ellis had merit.
 {¶ 4} After an examination of the record, this court finds the trial court's order is based upon the evidence and well reasoned; consequently, the order is affirmed.
 {¶ 5} The parties in this case are former business rivals. In the 1970s Zuercher developed a mechanism that produced artificial waves in swimming pools and marketed the product through a company he named WaveTek. Since this technology at the time was novel, Zuercher became a known expert in the industry. His machine, however, produced only one kind of wave.
 {¶ 6} Ellis entered the industry in the early 1980s by forming a New York corporation he called Aquatic Amusement Associates, Ltd. Aquatic designed, constructed, manufactured and sold equipment for community swimming centers and water parks. In an effort to rise above his competitors, Ellis sought a mechanism that was more advanced than the one Wavetek made, so, after some research he contacted Dirk Bastenhof, a native of the Netherlands who had secured a United States patent for a technology that produced a "multiple wave" pattern. This pattern resulted in more wave variety. Bastenhof eventually sold Ellis an exclusive license to market his patented technology in the United States.
 {¶ 7} Of course, Zuercher's business interests proceeded upon a similar effort to be competitive. He used the technology developed by Bastenhof to create what he called a "Varawave" machine; he and attorney Theodore Garver became partners in several projects that utilized this machine.
 {¶ 8} In 1986, Ellis brought an action in federal district court for patent infringement against Zuercher's and Garver's companies. The action resulted ultimately in a settlement agreement dated September 22, 1987. Zuercher and Garver admitted in the settlement agreement that their "Varawave" machine infringed on Aquatic's patent license.
 {¶ 9} However, Ellis respected his rivals' business acumen. Thus, Zuercher and Garver settled the patent infringement action by agreeing to sell the assets of their companies to Aquatic, in exchange for Aquatic's dismissal of its claims against them. Contemporaneously with the settlement agreement, Zuercher and Garver also each separately executed with Aquatic an additional "consulting agreement." These agreements were to be "governed by, interpreted and construed in accordance with the laws of the State of New York."
 {¶ 10} By the terms of Zuercher's consulting agreement, Aquatic retained his services for a term of five years. Paragraph 1 stated that the term was to "commence upon the Closing of [Aquatic's] acquisition of * * * assets under [the] Settlement Agreement;" thereafter, the consulting agreement "shall automatically be renewed for one year periods unless Zuercher [gave] notice of his election to terminate at least thirty (30) days prior to the end of * * * any renewal term."
 {¶ 11} Paragraph 2 listed the services Zuercher agreed to provide, including efforts to secure and complete any contracts in which he had been engaged during the patent infringement action. Paragraph 3 set forth the compensation Aquatic would pay him for the foregoing services and for "undertaking the obligations set forth in Paragraphs 6 and 7," in which he agreed he would neither compete with Aquatic nor make any disclosures about it.
 {¶ 12} Paragraph 3(c) promised Zuercher would be paid "an additional consulting fee" on "all pneumatic wave generation projects using equipment protected by" Bastenhof's patent that were sold in the United States and Canada by Aquatic during the consultant period. Zuercher's fee was based upon the number of such sales entered into by Aquatic in each year the consulting contract was in force. Aquatic would pay Zuercher a fee of $1000 per contract for the first three; the amount increased for four through six and again thereafter for each set of three contracts. This rate was to continue until he had "been paid aggregate fees of Two Hundred Thousand ($200,000.00) Dollars under this subparagraph."
 {¶ 13} Paragraph 4 stated any disputes arising between the parties to the agreement that involved an amount over $10,000 would be resolved in an "appropriate court," but, if in "any dispute any party is determined to be totally correct in such * * * action, the other party shall bear all costs and expenses, including reasonable attorneys' fees for the successful party."
 {¶ 14} Garver's consulting agreement contained similar terms, with the exception that Paragraph 3(c) stated Garver would receive half of the consulting fee Zuercher had agreed to be paid for each sale of the pneumatic wave generation projects protected by the Bastenhof patent.
 {¶ 15} Both consulting agreements contained a paragraph which stated that as an "additional incentive" for Zuercher and Garver to enter into the contracts with Aquatic, "Ellis hereby assumes personal responsibility for the undertakings of the Corporation." Thus, if Aquatic should "transfer [its] business or assets * * * to an independent third party," Ellis' liability under this paragraph would be extinguished only if Aquatic's obligations were "assumed by such third party."
 {¶ 16} In 1991, Aquatic became involved in a lawsuit it brought in federal district court against a Canadian company, White Water West Industries, Ltd., which had been using pneumatic wave generation technology in its projects. The lawsuit eventually was settled; Aquatic agreed to grant the Canadian company "a worldwide (exclusive of Europe) non-exclusive, non-assignable right to make and sell Wave generators." The Canadian company agreed to pay Aquatic a royalty fee for each machine thus sold.
 {¶ 17} On August 22, 1993 Zuercher sent a letter to Aquatic informing the corporation of his intent as of September 22, 1993 to cease performing consulting services under the contract. Zuercher indicated he expected all contractual payments to continue. After consulting with an attorney, Ellis decided to continue payments pursuant to Paragraphs 6 and 7 as long as Zuercher seemed to be in compliance with the obligations set forth therein. Garver continued to receive payments due him under his agreement.
 {¶ 18} In 1995, Aquatic filed for protection from creditors pursuant to Chapter 11 of the Bankruptcy Code in federal district court in New York. All payments to Zuercher and Garver ceased upon Aquatic's filing. Thereafter, the corporation's Plan for Reorganization made no mention of the two consulting agreements, although Aquatic continued to operate its business under the plan.
 {¶ 19} In August 1998 Garver and Zuercher, who used the name of his then-current company, Marcorp, filed the instant action against Aquatic and Ellis, seeking payments under the two consulting agreements. Simply stated, Zuercher claimed Aquatic had made inadequate payments to him after September 22, 1993; the plaintiffs further asserted Ellis remained personally liable for all sales Aquatic made after it filed for bankruptcy protection.
 {¶ 20} The case proceeded to trial before the bench. After listening to the testimony and reviewing all the exhibits, the trial court issued Findings of Fact and Conclusions of Law.
 {¶ 21} The court came to the following pertinent conclusions: 1) Aquatic's liability under the consulting agreements had been discharged pursuant to 11 U.S.C. § 1141(d)(1); 2) Ellis remained as guarantor under the agreements pursuant to "personal liability" paragraph contained in each, because pursuant to11 U.S.C. § 524(e) and New York law, Aquatic's discharge in bankruptcy did not affect Ellis' liability on the debt; 3)Ellis was liable to Garver for the sales Aquatic made of pneumatic wave generating equipment protected by the patent after Aquatic filed for bankruptcy; 4) sales made by the Canadian company in Canada were not protected by the United States patent; and, 5) Aquatic's and Ellis' obligations to Zuercher were terminated as of September 22, 1993.
 {¶ 22} In accordance with the foregoing, the trial court awarded Garver damages in the amount of $45,000 against Ellis, entered judgment in favor of Ellis on Zuercher's claims, and determined each party should bear his own costs because no party was "totally correct" as contemplated by Paragraph 4 of each consulting agreement.
 {¶ 23} Ellis filed his appeal from the portions of the trial court's order that determined he personally was liable to Garver and that refused to award attorney's fees. Zuercher subsequently filed a cross-appeal to challenge the court's decision to award judgment in favor of Ellis on Zuercher's claim.
 {¶ 24} Ellis' assignments of error state:
 {¶ 25} "A. Given the bankruptcy discharge of the principal debtor, the trial court erred in holding Ellis liable under a guarantee contract that was not unconditional.
 {¶ 26} "B. The trial court erred in concluding that Ellis was not "totally correct" in the proceeding below and thereby erred in failing to award attorney fees and costs to Ellis."
 {¶ 27} Ellis first argues the trial court misinterpreted New York law in holding him personally liable for any debt Aquatic owed to Garver after the corporation's bankruptcy discharge. He contends the consulting agreement's "personal responsibility" clause was not broad enough to survive discharge of Aquatic's debts in bankruptcy. This court disagrees.
 {¶ 28} Under New York law, the general rule is that the release of a principal debtor operates to discharge a party who is only secondarily liable on a debt, such as a guarantor.Compagnie Financier de Cie et de L'Union Europeenne v. MerrillLynch (2nd. Cir., 1999), 188 F.3d 31, 34. The guarantor, however, can consent to remain liable after the principal debtor's discharge. Id. In such case, the guarantor becomes a "co-obliger" who, along with the principal debtor, promises to pay the debt. The record in the instant case demonstrates the trial court correctly concluded Ellis intended to become a "co-obliger" with Aquatic in the consulting agreements.
 {¶ 29} First, the "personal obligation" clause contained in each contract had only one restriction, viz., Ellis' liability was extinguished only if the next owner of Aquatic's assetsexpressly agreed to assume the debts to Zuercher and Garver. Second, the consulting agreements were not included in Aquatic's bankruptcy proceeding, thus reflecting an intent on Ellis' part to remain responsible for payment on the agreements. Third, Ellis specifically expressed this intent during his testimony at trial. With regard to the paragraphs titled "guarantee," Ellis stated his belief the language meant the debt was his "personal responsibility."
 {¶ 30} The trial court's conclusion is supported by competent, credible evidence; therefore, it will not be overruled. C.E. Morris Co. v. Foley Const. Co. (1978),54 Ohio St.2d 279.
 {¶ 31} Accordingly, Ellis' first assignment of error is overruled.
 {¶ 32} The disposition of Ellis' first assignment of error negates the argument he presents in his second; consequently, it, too, is overruled.
 {¶ 33} Proceeding to Zuercher's cross-appeal, he assigns as error the following:
 {¶ 34} "Cancellation of the consulting portion of the contract does not relieve defendant Aquatic from being required to continue payments until an aggregate of $200,000.00 has been reached."
 {¶ 35} Zuercher argues that, pursuant to New York law as set forth in Terwilliger v. Terwilliger (2nd Cir., 2000),206 F.3d 240, 245, matters extrinsic to an agreement may not be considered when the intent of the parties can fairly be gleaned from the face of the instrument. He contends the terms of his consulting agreement with Aquatic demonstrate he "was entitled to terminate the consultation without terminating the contract." Simply by making such a contention, Zuercher proves his assignment of error is baseless.
 {¶ 36} Pursuant to Paragraph 10 of Zuercher's consulting agreement, he could terminate it by notifying Aquatic thirty days prior to the beginning of the next renewal period. Zuercher complied with this requirement by his letter of August 22, 1993.
 {¶ 37} According to that same paragraph, Zuercher's election to "refuse to render the consulting services provided for" in the agreement had the following effect: "* * * all obligations of the corporation and Ellis hereunder shall terminate," except that "the obligation to pay amounts otherwise due hereunder for contracts executed prior to such terminating event shall survive the termination." (Emphasis added.)
 {¶ 38} Zuercher admitted at trial that he had received payment from Aquatic for contracts executed prior to September 22, 1993. Ellis, moreover, testified that although he wasn't sure if he should treat the non-disclosure and non-competition clauses as separable from the remainder of the contract, he made a "business decision" to pay Zuercher for his continued compliance with those clauses.
 {¶ 39} Based upon the evidence, the trial court correctly interpreted the terms of the consulting agreement to mean that Zuercher's termination of his services terminated Aquatic's obligation to pay him for contracts executed after September 22, 1993.
 {¶ 40} Accordingly, Zuercher's cross-assignment of error is overruled.
 {¶ 41} The trial court's opinion and order are affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Dyke, P.J. concurs Corrigan, J. Dissents (SEE ATTACHED DISSENTING OPINION)
 DISSENTING OPINION